UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-80113-CIV-MARRA/JOHNSON

THE VARIABLE ANNUITY LIFE
INSURANCE COMPANY (VALIC),
a corporation authorized to do
business in the state of Florida

      Plaintiff

vs.

NICHOLAS DULL

      Defendant.

_____/

## ORDER AND OPINION ON MOTION FOR PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court upon VALIC's Motion For a Preliminary

Injunction [DE 3].  The motion is fully briefed and ripe for review.  The Court has

carefully considered the relevant filings and is fully advised in the premises.

## Background

Plaintiff, the Variable Annuity Life Insurance Company ("VALIC") specializes in

providing retirement plans, including fixed and variable annuity contracts, to its

clients.  VALIC's clients are primarily employees of tax exempt I.R.C. § 403(b)

organizations, such as healthcare, education, and governmental organizations.

Complaint ("Compl.") ¶ 7; 1/27/09 Declaration of David Allen ("Allen Decl."), DE 4,

Exhibit ("Ex.") 1, ¶ 3.  Until his resignation, Defendant Nicholas Dull ("Dull") was an

employee of VALIC as a registered representative.  *See* Registered Representative

Agreement  (the "Agreement"), attached to the Complaint as Ex. A, ¶ 2.  Dull, like all

other VALIC registered representatives, marketed and sold VALIC financial products to VALIC's 403(b) customers, as well as to other VALIC clients.  Compl. ¶ 10.

As a VALIC registered representative, Dull benefitted from, among other things, being assigned a book of business consisting of all previously established VALIC group accounts in his assigned area, which consisted of the Palm Beach County School District and Palm Beach Community College.  Allen Decl. ¶¶ 4-7.

VALIC also granted Dull access to compilations of VALIC's protected customer information - which is stored and maintained on VALIC's proprietary databases AGILEnet and 4Sight - so he could properly service these accounts.  Allen Decl. ¶¶ 8-13.  VALIC has taken substantial measures to maintain the secrecy of this detailed customer information because it is a key component of VALIC's success.  Allen Decl. ¶¶ 8-13, 17-18.  For example, before the AGILEnet system will permit the user to download any information from the AGILEnet system, the user must also agree to the User Agreement.  The User Agreement states, "I will not copy any downloaded information from this site onto any computer not issued by AIG VALIC or onto any media such as floppy discs or writable CDS."  Allen Decl. ¶¶ 9-10.  VALIC provided Dull access to confidential and proprietary information about group accounts, eligible participants and related assets under VALIC's management.  Compl. ¶ 11.  VALIC considered detailed customer information as its trade secret, and it is confidential and proprietary information.  Compl. ¶ 15.  VALIC entrusted Dull with its trade secrets and related customer information so that he could service those customer

relationships for VALIC's benefit.  *Id.*

As a condition of employment with VALIC, Dull was required to execute the Registered Representative Agreement with VALIC Financial Advisors ("VFA"), a wholly-owned subsidiary of VALIC.  Allen Decl. ¶¶ 14-16.  The Agreement contains Dull's acknowledgment that he would have "access to and become familiar with certain trade secrets and other confidential and proprietary information that belongs to Broker-Dealer and Protected Companies[1] . . ."  Agreement ¶ 4.g(3), DE 1, Ex. A.  In consideration for this entrustment, Dull agreed that:

(1)  he would not directly or indirectly disclose VALIC's trade secrets, including but not limited to, customer identities and account information, during the term of the Agreement, or after its termination except as required in the regular course of his business for VALIC. Agreement ¶ 4.g(3)(a);

(2)  he would not, during the term of his Agreement, and for a two-year period after termination of his employment, directly or indirectly disclose or use any confidential and proprietary information in any way except as required in the regular conduct of his business for VALIC. Agreement ¶ 4.g(3)(b);

(3)  upon the termination of his employment, Dull would return to VALIC all such trade secrets and other proprietary and confidential information. Agreement ¶ 4.g(2);

(4)  he would not, for a one-year period following termination of employment with VALIC, directly, or indirectly, solicit business from VALIC customers who were within his assigned territories during the one-year preceding his termination.  Agreement ¶¶ 4.h and 4.h(2); and

_____

[1]  VALIC is defined as one of the "Protected Companies" for purposes of the Agreement.  Compl. Ex. A ¶ 4.g(1)(a).

(5)     injunctive relief would be appropriate if he violated his obligations under paragraph 4.g and 4.h of his Agreement, running for one-year from the date of the entry of the injunction.  Agreement ¶ 4.h(4).

*See* Agreement attached to the Complaint as Exhibit A.  Dull provided notice to VALIC on November 5, 2007, that he was voluntarily terminating his employment effective November 14, 2007.  Compl. ¶ 30.  Dull then went to work for AXA, a direct competitor of VALIC, in south Florida.  Compl. ¶ 31.

VALIC asserts that despite the contractual obligations listed above, it has determined that just before his resignation, Dull downloaded and printed VALIC's trade secret, proprietary customer information.  VALIC reports that after seeing "a wave" of asset transfers from VALIC customers formerly serviced by Dull to AXA beginning in October of 2008, VALIC forensically examined the hard drive of Dull's VALIC-issued laptop computer.  The investigation revealed that the day before Dull resigned, he downloaded and printed lists of all his assigned VALIC customers and their account information and contact information.  *See* Declaration of Donald Vilfer[2] ("Vilfer Decl.") dated 1/20/09, DE 4, Ex. 3 at ¶¶ 4-10.  Dull allegedly also copied all

---

[2]  Donald Vilfer is co-owner and operator of Vilfer & Associates, a litigation support and investigative services firm.  His practice areas include general and complex investigative matters as well as computer forensics, including examination of thumb drives and computers for theft of company data.  Prior to joining Vilfer & Associates, he served as Senior Director of the Litigation Support and Investigative Services Group of Perry-Smith LLP, a large accounting firm, from 2001-2002.  He was a former Special Agent in charge of the Federal Bureau of Investigation's White Collar Crime and Computer Crime Unit in Sacramento, California, and was formerly a Supervisory Special Agent at FBI Headquarters in Washington, DC.  DE 33-2, Ex. 4.

of his Lotus Notes (an electronic e-mail and calendaring system provided by VALIC) files onto a USB thumb drive capable of storing large amounts of digital information. *Id*. VALIC believes the Lotus Notes files contain additional customer information. VALIC states that Dull has not returned any of this customer information. In addition to taking and keeping the customer information, VALIC believes Dull is using the information to take business away from VALIC. For example, VALIC asserts that over $1 million in assets have transferred from Dull's old VALIC book of business to AXA between October 2008 and January 2009. *See* Declaration of Darlene Stelly ("Stelly Decl.") ¶ 12.

VALIC has filed a Complaint for preliminary and permanent injunctive relief alleging that Dull has misappropriated VALIC trade secrets and confidential and proprietary information in violation of Chapter 688 and § 542.335, Florida Statutes (Claim 1); Breach of Contract (Claim 2); and intentional interference with existing and prospective business relations (Claim 3). VALIC requests that the Court issue a preliminary injunction prohibiting Dull from:

1. directly or indirectly disseminating VALIC's confidential and proprietary information, including, but not limited to, customer requirements provided to Dull by VALIC, whether maintained electronically or otherwise;

2. directly or indirectly disclosing or using VALIC's trade secrets, including, but not limited to, customer identities and account information and the materials, processes, data, documentation, and knowledge embodied in AGILEnet, 4Sight, and other proprietary VALIC software. VALIC asserts that such information is a trade secret, whether contained in an electronic, printed or other format, or whether committed, in whole or

in part, to Dull's memory;

3.     directly or indirectly using VALIC's trade secrets or confidential and proprietary information to induce or attempt to induce any "Protected Customer" to end or alter their relationship with VALIC;

4.     accepting business from any of his former VALIC customers whose account information he retained after his employment with VALIC was terminated; and

5.     retaining or refusing to return to VALIC any tangible and electronic documents and information in Dull's possession which refer or relate to VALIC's trade secrets or proprietary and confidential information to the extent that such documents and information were derived by or provided to Dull in connection with his relationship with VALIC.

VALIC states, "[a]t the outset, however, VALIC wishes to emphasize that it requests a fairly limited injunction.  VALIC seeks only the protection of its legitimate business interests by requiring the return of its trade secret information and prohibiting Dull from *unfairly* competing with VALIC.  VALIC in no way seeks to oust Dull from the industry or the region.  Dull may compete with VALIC today, selling competing products in the very region he once represented VALIC.  He cannot, however, under applicable law and contractual obligations, retain or use VALIC's trade secrets and other confidential and proprietary business information to target, solicit, contact, or otherwise induce VALIC customers to do business with him or his new employer."  DE 4 at 1-2 (emphasis in original).  This motion will be granted in part and denied in part.

**Legal Standard**

A party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 ("Rule 65") must demonstrate  (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest.  *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 968 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

**Application**

I.   Likelihood of Success

The first element to consider is whether VALIC has demonstrated a substantial likelihood that it will prevail on the merits of its claims.[3]  VALIC's claims can be segregated into two categories: (1) that Dull took and has not returned customer information that contains confidential and proprietary VALIC information; and (2) that Dull has engaged in actual or threatened misappropriation of these trade secrets.

---

[3]  Dull devotes four sentences to the argument that VALIC will not succeed on the merits of its claims because the agreement he signed was with the Broker-Dealer AIG (a/k/a VALIC Financial Advisors or VFA), not VALIC.  This argument is rejected. VALIC is defined in the agreement as both an Affiliated and Protected Company, and is clearly a third-party beneficiary of the agreement.  *See* Court Order and Opinion Denying Motion to Compel Arbitration, DE 42.

Dull Took and Retained Customer Lists

There is no dispute that VALIC's customer lists and related information constitute protectable trade secrets[4] under Florida law.  *See* Fla. Stat. § 688.002(4);[5] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox,* No. 01-8800-CIV, 2001 WL 1200656, at *4-5 (S.D. Fla. Oct. 4, 2001) (Florida law protects customer lists and information from misappropriation and conversion through injunctive relief); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dunn*, 191 F. Supp. 2d 1346, 1351-52 (M.D. Fla. 2002) ("Plaintiff's customer lists and the information contained therein are trade secrets, since the Court finds that Plaintiff has shown that it has taken reasonable efforts to maintain their secrecy and that they give Plaintiff an advantage over those who do not know of their contents or are unable to use them"); *East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. Dist. Ct. App. 2001) (customer list was a trade secret

---

[4]  Dull maintains, however, that customer information he has in his memory or that is in the public domain does not qualify as a trade secret.  Based on the limited ruling made herein, this issue need not be resolved at this point in the litigation.

[5]     Pursuant to Florida's Uniform Trade Secrets Act, "'[t]rade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

where evidence showed it was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for a unique business); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F.Supp. 1555, 1558 (S.D. Fla. 1992).

Dull avers that he returned his customer list to VALIC and that it was in one of the two boxes he returned to his supervisor.  Dull Aff., DE 29, Ex. B.  Dull's supervisor, however, has filed an affidavit that says no customer list was contained within the boxes Dull returned.[6]  3/2/09 Allen Declaration ¶¶ 5-6, DE 33-3.  In addition, the results of an extensive forensic examination of Dull's laptop hard drive reveal that a significant amount of confidential and proprietary information was accessed in the days and hours just prior to Dull's resignation.  *See* 1/20/09 and 3/20/09 Vilfer Declarations, and Vilfer's Investigative Summary, DE 33-2.  Based on the evidence presented, the Court finds that VALIC has met its burden to

_____

[6]  5.  When I inspected the two boxes of files Mr. Dull returned in acordance with my typical practice after his resignation, I did not find any customer lists.  I would have remembered finding a customer list because it is an unusual item to be found in an advisor's returned materials.  It is not a common practice for advisors to print out customer lists.  Also, I would have remembered finding a customer list because of the importance and value of the lists, which leads me to look specifically for the lists when reviewing an advisor's returned materials.

6.  When reviewing Mr. Dull's returned materials, I found some business cards and some sales literature, all of which I destroyed.  I asked Mr. Dull if he had any unused VALIC forms, which were items that needed to be returned, but he informed me that he had destroyed all VALIC forms previously in his possession.

demonstrate that it will likely prevail on its claim that Dull kept and has not returned detailed customer information that contains confidential and proprietary information in violation of his Agreement with VFA.

Misappropriated Trade Secrets

The Court further finds that VALIC has not met its burden to demonstrate that it will likely prevail on its claim that Dull has engaged in actual or threatened misappropriation of these trade secrets.  The declarations and forensic evidence show that no VALIC accounts were transferred to AXA until approximately ten months after Dull left VALIC and went to work for AXA.  It was about that time that AIG was on the brink of bankruptcy and the United States Federal Reserve intervened in an effort to stabile it with billions of dollars in loans.  Many of those account holders who moved from VALIC to AXA have filed affidavits stating that they contacted Dull because they were concerned about the security of their funds being held by AIG VALIC or AIG Retirement.  With no other evidence to support its contention that Dull violated his restrictive covenant by directly or indirectly soliciting former VALIC clients, the Court finds that VALIC is not likely to prevail on the merits of its claim for misappropriate of trade secrets.  Accordingly, the Court need only continue its analysis under Rule 65 for that part of the requested injunction that relates to Dull's retention of confidential information.[7]

_____

[7] Of course, this Court's findings at the preliminary injunction stage are not binding as to either party relative to the granting or denying of a permanent

II.      Irreparable Injury

In Florida, a statutory presumption of irreparable harm exists upon violation of an enforceable restrictive covenant.  Under § 542.335(j), Florida Statutes, a party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined. Rather, the statute provides that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."  Fla. Stat. §§ 542.335(j), 542.33; *see also VALIC v. Hausinger*, 927 So.2d 243, 245 (Fla. Dist. Ct. App. 2006) (trial court's failure to consider the harm presumed under Florida law, which includes the potential damage to VALIC's longstanding relationships with customers and the protection of confidential client information, was reversible error); *America II Elecs., Inc. v. Smith*, 830 So.2d 906, 908 (Fla. Dist. Ct. App. 2002).  Where customer lists are involved Florida courts have held that injunctive relief is appropriate.  *See e.g., Hausinger,* 927 So.2d at 245; *Carnahan v. Alexander Proudfoot Co.*, 581 So.2d 184 (Fla. Dist. Ct. App. 1991).

Here, the record reflects that VALIC's evidence is sufficient to prove a violation of an enforceable restrictive covenant.  Therefore, the evidence is sufficient to create a rebuttable presumption of irreparable injury for purposes of obtaining an

---

injunction.  *See e.g., David Vincent, Inc. v. Broward County, Fla.*,  200 F.3d 1325, 1331 n.8 (11th Cir.  2000).

injunction under § 542.335, Fla. Stat.  *See Don King Prods., Inc. v. Chavez,* 717 So.2d 1094 (Fla. Dist. Ct. App. 1998).  VALIC faces irreparable injury, including lost trade secrets, business, and customer trust and goodwill, if the Court does not grant injunctive relief to preserve the status quo.

III.   <u>Threatened Injury Versus Damage an Injunction Might Cause</u>

The Court must next evaluate the balance of harms between the parties. VALIC has spent considerable time and expended many resources to establish its customer base in the annuities market.  Allen Decl. ¶ 3.  VALIC alleges that Dull benefitted from, among other things, being assigned a book of business consisting of all previously established VALIC group accounts in his assigned area, which consisted of the Palm Beach County School District and Palm Beach Community College.  *Id*. ¶¶ 3-7 (detailing the assorted benefits a VALIC representative receives).   Moreover, the Court has already determined that the injury to VALIC will be irreparable.

Dull argues that issuance of the injunction would have a devastating effect on him as he would be unable to contact the clients with whom he has developed strong relationships over the course of his career in the financial services industry.  "This would cause him to lose most of his clients and cripple him professionally.  In effect, he would have to start his career in the securities industry all over again."  It appears that by making this argument, Dull seeks to challenge the viability of the entire Agreement he signed.  In any event, this argument does not address the effect of issuing an injunction on the narrow actions contemplated by the Court at this time.

The Court also notes that Dull expressly agreed to be enjoined if he violated the Agreement.  The Court finds, therefore, that the balance of harms weighs in favor of VALIC.

IV.   <u>Public Interest</u>

Florida's public policy favors enforcement of reasonable non-disclosure covenants.  *See, e.g.*, Fla. Stat. §§ 542.33, 608.001, 812.081.  Indeed, when arguing that an otherwise enforceable covenant should not be enforced based on public policy, the party opposing its enforcement must show that the specific public policy requirements "substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint." Fla. Stat. § 542.335(1)(i).  Dull makes no such argument.  Accordingly, the Court finds that an injunction will further the public interest.

<u>Conclusion</u>

In sum, the Court finds that the VALIC has demonstrated a substantial likelihood of success on the merits, as well as, irreparable harm as to Dull's taking and retention of trade secrets.  Balancing these factors with the relative harm to the parties and the public interest it is hereby

ORDERED and ADJUDGED that the Plaintiff's Motion for a Preliminary Injunction is GRANTED in part and DENIED in part [DE 3].  Nicholas Dull is enjoined from, without further order of the Court or VALIC's written consent:

retaining VALIC's confidential and proprietary information and trade secrets, including customer identities and account information and the materials, processes, data, and documentation embodied in AGILEnet, 4Sight, and other proprietary VALIC software copied or downloaded by Dull.

Nicholas Dull is ordered to return to VALIC any and all tangible and electronic documents and information in Dull's possession, custody or control relative to VALIC's trade secrets or proprietary and confidential information described in the preceding paragraph within ten (10) days.  The Preliminary Injunction shall remain in effect pending further Order of this Court.

As a condition to the enforcement of this order, VALIC shall post a bond in the amount of $10,000.00 to stand as security in the event it is determined that this preliminary injunction was wrongfully issued.

The parties are directed to file their joint scheduling and joint discovery report within 15 days of this Order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of September, 2009 at 2:46 P.M.

_____
KENNETH A. MARRA
United States District Judge

copies to:
All counsel of record